## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 06 C 3807 | **DATE** | 10/26/2009 |
| **CASE TITLE** | Cobige vs. City of Chicago | | |

**DOCKET ENTRY TEXT**

The Court denies Defendants' Motion to Bar Plaintiff's Expert Cardiologist [153] in its entirety.

■[ For further details see text below.]

Notices mailed by Judicial staff.

---

## STATEMENT

      Plaintiff Maurice Cobige, as Son, Next Friend, and Special Representative of the Estate of Patricia Cobige, deceased, brought an eight-count Second Amended Complaint alleging constitutional violations under 42 U.S.C. § 1983, as well as state law claims against the City of Chicago and certain individual Defendants. The Court granted in part and denied in part Defendants' summary judgment motion, and thus the only claims remaining for trial include Plaintiff's constitutional deliberate indifference claim, Illinois Wrongful Death Act claim, and Illinois Survival Act claim. In the present motion, the remaining Defendants have moved the Court pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), to exclude the expert opinion of Dr. Daniel Fintel, M.D. For the reasons addressed below, the Court denies Defendants' motion in its entirety. The Court also denies Defendants' request to enter summary judgment as to Plaintiff's Illinois Wrongful Death Act Claim as alleged in Count VI of the Second Amended Complaint.

| | Courtroom Deputy Initials: | KF |
|---|---|---|

## BACKGROUND

Decedent Patricia Cobige was a 46-year-old African-American woman and resident of Chicago, Illinois. After Chicago Police Officers arrested Cobige for possessing heroin on June 10, 2006, they took her to the 25th District Police Station and left her at the women's lockup. During her time at the 25th District Police Station, Cobige was in pain. She was bent over at times, and, at other times, she was in a fetal position on the bed. Women who were detained with Cobige testified that she was sick. According to a fellow arrestee, Cobige said she needed a doctor a dozen times and cried out to the guards when they walked by. Cobige told the jail guards that she was sick, but the guards told her that nothing was wrong and that she was only dope sick.

The day after Cobige's arrest, police officers gathered the arrestees in Cobige's jail cell, including Cobige, to transport them to bond court. On the way to the transport wagon, Cobige was slumped down and walked slowly. Defendant Officers Rene Dimilanta and Piotr Czarniecki then transported the female arrestees to bond court. At bond court, Cobige, who squatting down, told a Cook County Sheriff's Deputy that she was sick and that she needed to go to the hospital. Also, while at bond court, Cobige repeatedly told Officer Dimilanta that she needed to go to the hospital. Because Cobige was sick, she was denied entry to bond court.

Upon returning to the 25th District Police Station, Defendants Chicago Police Department civilian detention aide Maria Diaz and police officer Julia Lawler were on duty. Officer Dimilanta informed them, as well as Sergeant Thomas Motzny, that Cobige was rejected from bond court due to abdominal pain. Cobige then told Diaz that she was sick and had bad cramps. Diaz testified that Cobige was slouching, bent over, and looked tired. Before Diaz and Officer Lawler finished their shift at 2 p.m., Diaz heard Cobige call out to her from her cell saying that she did not feel well and that she felt sick to her stomach. After Diaz and Officer Lawler informed Sergeant Motzny that Cobige was sick, Sergeant Motzny did not check on Cobige to see how she was doing. At that time, Sergeant Motzny said he was not going to send Cobige to the hospital.

At the end of her shift, Diaz told the officer who relieved her that Cobige was brought back from bond court because she was sick and that Cobige needed medical papers to go to bond court the next day. Also, Diaz told her replacement to ask the sergeant on the afternoon shift to send Cobige to the hospital, after which the relief officer said she would let her sergeant know about Cobige's condition. Moreover, at the end of her shift, Officer Lawler believed that someone on the next watch would get Cobige to the hospital to get her medical clearance for bond court. Officer Lawler also testified that she knew the next shift was aware that Cobige had been returned from bond court because of her stomach cramps.

Eventually, the night shift took over around 10 p.m. on June 11, 2006. The night shift observed that Cobige appeared to be sleeping in her cell and did not attempt to wake her. A civilian detention aide testified that when she first saw Cobige on the night of June 11, 2006 around 10 p.m., Cobige looked like she was asleep under the bench in the cell. Later, when the civilian detention aide entered Cobige's cell after 1:00 a.m. on June 12, 2006, Cobige was in the same position she had been in around 10 p.m. the evening before. Shortly thereafter, the civilian detention aide discovered that Cobige was dead.

## LEGAL STANDARDS

Federal Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of opinion or otherwise." Fed. R. Evid. 702. The "purpose of *Daubert* was to require courts to serve as gatekeepers so that unreliable expert testimony does not carry too much weight with the jury." *United States v. Ozuna,* 561 F.3d 728, 737 (7th Cir. 2009). More specifically, the purpose of the district court's gatekeeping function is "to make certain that an

expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed.2d 238 (1999).  The Court must therefore consider whether:  (1) "the witness [is] qualified as an expert by knowledge, skill, experience, training, or education;" (2) "the expert's reasoning or methodology underlying the testimony [is] scientifically reliable;" and (3) "the testimony ... [will] assist the trier of fact to understand the evidence or to determine a fact in issue." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) (citations omitted).  As the Seventh Circuit recently noted, "qualifications alone do not suffice.  A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*."  *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (quoting *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999)).  In sum, an "expert's ultimate opinion must be grounded in the scientific process and may not be merely a subjective belief or unsupported conjecture." *Lewis*, 561 F.3d at 705.

The *Daubert* decision lists relevant considerations to determine reliability, including testing, peer review, error rates, and acceptability in the relevant scientific community, *see id.* at 593-94, but the Supreme Court has clearly stated that "the test of reliability is flexible, and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 141 (internal quotation omitted). "Rather the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142.

## ANALYSIS

### I.       Dr. Fintel's Background and Qualifications

Dr. Fintel earned a B.S., *magna cum laude,* in molecular biophysics and biochemistry from Yale College in 1975 and his M.D., *magna cum laude,* from Harvard Medical School in 1979.  Dr. Fintel did his internship and residency at Mount Sinai Medical Center in New York City and did a clinical fellowship in cardiovascular disease at Johns Hopkins Medical Institution in Baltimore, Maryland.  During his cardiology fellowship, Dr. Fintel gained extensive emergency room experience.  Meanwhile, Dr. Fintel has won a number of academic awards and honors in the field of cardiology and is presently a Professor of Medicine at the Northwestern University Medical School in Chicago, Illinois.  Dr. Fintel has practiced medicine for over 30 years, has been an attending physician at Northwestern Memorial Hospital since 1990, and has been the Director of the Coronary Care Unit at Northwestern Memorial Hospital since 1992.  While running the Coronary Care Unit, Dr. Fintel is in the emergency room several times a week to evaluate patients.

According to Dr. Fintel's deposition testimony, he has handled between 20-30 patients who have died from cardiomyopathy, the condition listed in the post mortem report as the cause of Cobige's death.  Moreover, Dr. Fintel has been called as an expert witness to testify in over 60 trials in the last twenty years.  Based on Dr. Fintel's education, professional studies, knowledge, and extensive experience, he is qualified to testify in the area of cardiology.  *See Ervin*, 492 F.3d at 904; Fed. R. Evid. 702.

### II.      Dr. Fintel's Opinions

As indicated in his expert report, Dr. Fintel reviewed the entire medical examiner's file, including the Cook County Medical Examiner's Report, a post mortem examination report, autopsy photographs and x-rays of Cobige's heart and other physiology, and Cobige's negative toxicology report, among other documents.  Dr. Fintel also reviewed Cobige's prior medical records, which reveal her prior diagnosis of hypertension, as well as photographs of Cobige on the floor of the police lock-up showing Cobige's approximate physical position at the

time her dead body was first discovered.  In addition, Dr. Fintel reviewed the witnesses' and Defendants' statements and deposition testimony, including the testimony of certain Defendants who observed and talked to Cobige during the two days prior to her death.

In his expert report, Dr. Fintel opined that "the cause of Ms. Cobige's death was due to a sudden arrhythmia in the setting of her hypertensive heart disease.  The presence of significant abdominal pain likely led to the release of endogenous adrenaline and other stress hormones." (R. 153-1, Defs.' Mot., Ex. A, Fintel Report, at 2.)  Dr. Fintel further stated that "the presence of abdominal pain, more likely than not, would have led to a life-threatening arrhythmia, which was the cause of her death." (*Id.*)  Dr. Fintel further explained:

> Had Ms. Cobige been referred for prompt evaluation shortly after being placed in custody, she would likely have received analgesics, which would have treated her abdominal pain and reduce[d] the tendency of high levels of adrenaline-like substances in the bloodstream which were bombarding her heart.  Medical evaluation would have also included the performance of an EKG, which might have revealed an ongoing condition of cardiac arrhythmia or ischemia, both which could have been treated by admission to the hospital and the use of appropriate medications.  Ms. Cobige had a nearly normal life expectancy at the time of her death.  In summary, had appropriate diagnostic testing and treatment been provided to Ms. Cobige, she would likely have not expired in custody on June 12, 2006.

(*Id.*)

## III.   Defendants' Arguments

### A.   Pain Near Time of Death

In their *Daubert* motion, Defendants first take issue with Dr. Fintel's opinion that the "presence of significant abdominal pain likely led to the release of endogenous adrenaline and other stress hormones."  Defendants also question Dr. Fintel's opinion that a pain killer, *e.g.,* an analgesic, may have reduced the tendency of high levels of adrenaline-like substances in Cobige's bloodstream.  More specifically, Defendants argue that Dr. Fintel's opinions are premised on the conclusion that untreated pain caused Cobige's fatal arrhythmia and that there is no evidence in the record that Cobige was in pain at or near the time of her death.  In other words, Defendants argue that Dr. Fintel's opinion that Cobige's death was due to untreated abdominal pain lacks an adequate factual foundation.  *See* Fed.R.Evid. 702(1).

There is sufficient evidence in the record to support that Cobige experienced severe abdominal pain while she was in custody at the 25th District Police Station.  Although the record reveals that some of the police officers and civilian aides did not observe Cobige in pain, there is also evidence in the record that Cobige did not move in her cell for at least three hours before a civilian aide discovered that she was dead.  As such, Defendants' argument that Cobige was not in pain at or near the time of her death is refuted by the evidence that no one knew that Cobige was dead for hours.  The Cook County medical examiner's report pronouncing Cobige dead at 2:30 a.m. on June 12, 2006, for example, states that Cobige was "cold to the touch with rigor present to her jaw, arms and legs," indicating that Cobige had been dead for some time before she was discovered.  (R. 161-13, Pl.'s Ex. L, Med. Exam., at 1.)  Meanwhile, Dr. Fintel relies on the statement that Cobige's cell mate, Pamela Weeks – who was in the cell when Cobige died – in which Weeks explained that prior to Cobige's death, she was coughing and appeared to be "dope sick." (Fintel Report, at 1.)  In fact, Defendants' expert witness also concluded that Cobige "seems to have experienced continued abdominal pain off and on." (R. 161, Ex. F. Santucci Report, at 1.)  As such, there is sufficient factual support for Dr. Fintel's opinion that Cobige experienced pain and stress around the time of her death, especially in light of the fact that no one knows exactly when Cobige died.

Indeed, it is well-established that "[e]xperts routinely base their opinions on assumptions that are necessarily at odds with their adversary's view of the evidence." *Richman v. Sheahan,* 415 F.Supp.2d 929, 942 (N.D. Ill. 2006); *see also General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ("Trained experts commonly extrapolate from existing data."). As the Seventh Circuit instructs, "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000); *see also United States v. Pansier,* 576 F.3d 726, 738 (7th Cir. 2009) (it is "up to the jury to determine the import of any discrepancy as a factual matter."). Therefore, Defendants' argument that Dr. Fintel's opinion is inadmissible based on its factual foundation fails. Instead, the soundness of the factual basis of Dr. Fintel's opinion is a question for the jury.

## B.      Prompt Medical Attention

Next, Defendants dispute Dr. Fintel's opinion that had Cobige been referred for prompt medical evaluation shortly after being placed in custody, the performance of an EKG might have revealed an ongoing condition of cardiac arrhythmia that could have been treated by admission to the hospital and use of appropriate medications. Defendants first argue that Dr. Fintel does not have the "essential expertise" to offer an opinion about when a person in police custody comes to an emergency room. As discussed, however, Dr. Fintel had extensive experience working in an emergency room as a cardiologist when he did a clinical fellowship in cardiovascular disease at Johns Hopkins from 1982-85. In addition, while running the Coronary Care Unit at Northwestern Memorial Hospital – for the last 17 years – Dr. Fintel is in the emergency room several times a week to evaluate patients. Meanwhile, without a cogent explanation, Defendants' distinction that Dr. Fintel does not have experience with "people in police custody" in the context of an emergency room is unavailing. Therefore, Defendants' argument that Dr. Fintel is not qualified to opine as to emergency room procedures is without merit.

Defendants also argue that Dr. Fintel's opinion that an EKG would have been performed had Cobige been referred to prompt evaluation lacks a factual foundation. *See* Fed.R.Evid. 702(1). Defendants partially rely on the following testimony at Dr. Fintel's deposition in support of their argument:

Q.      Okay. And, Doctor, if a person presented to the emergency room and all they complained of was a stomach cramp, absent any other symptoms, would they receive and EKG or an echocardiogram? What is the likelihood that that would occur?

A.      If their blood pressure were elevated and if they were an adult over 40, as she was, as part of the initial emergency room evaluation of abdominal pain, one always has to consider a potential cardiac cause.

...

But when you're the emergency room physician encountering a patient, and adult with pain above the belly button, an echocardiogram is part of that diagnostic evaluation because you can't be sure that the cause of the abdominal pain is an abdominal problem. It may be a cardiac problem.

...

So obtaining an electrocardiogram is part of the evaluation of an adult which – who is complaining of significant abdominal pain.

(Fintel Dep., at 52-53.) Dr. Fintel also testified that an electrocardiogram is usually part of the evaluation of a

patient with "new onset" abdominal pain of unknown etiology.  (*Id.* at 58-59.)

In their *Daubert* motion, Defendants argue that there is no factual evidence that Cobige's pain was above the belly button, that her blood pressure was elevated, or that her abdominal pain was "new onset," namely, not of prior origin.  Thus, Defendants argue, Dr. Fintel's opinion that an EKG would have been performed is merely speculation.  Again, Dr. Fintel based his opinions on certain facts and assumptions, *see Richman*, 415 F.Supp.2d at 942, as he explained at his deposition:

> [B]ased on her presentation with the symptoms that [Cobige] manifested following her arrest and not being able to stand up when she was in lineup and then complaining to a number of caregivers that she was having significant abdominal pain, it is my opinion that that required evaluation, and that evaluation would have led to the performance of testing that might have diagnosed her underlying cardiac condition, or at least led to a sequence of events that would have resulted in studies like an echocardiogram and observation of the patient.

(Fintel Dep., at 63-64.)

Thus, whether there is evidence in the record that Cobige's pain was above her belly button, that her blood pressure was elevated, or that her abdominal pain was "new onset" does not create an "analytical gap" between the data and the opinion offered, as Defendants suggest.  *See General Elec. Co.*, 522 U.S. at 146 ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").  There is evidence in the record to support Dr. Fintel's factual assumptions.  In short, Dr. Fintel's expert opinions are not bare-boned conclusions without any factual basis or bereft of analytical reasoning.  *See Mid-State Fertilizer Co. v. Exchange Nat'l Bank,* 877 F.2d 1333, 1339 (7th Cir. 1989).

## IV.   Relevancy

Finally, Defendants argue that Dr. Fintel's opinions are not relevant or helpful because they do not go to the legal cause of Cobige's fatal arrhythmia.  *See Ervin*, 492 F.3d at 904; Fed.R.Evid. 702.  More specifically, Defendants argue that – based on their expert's opinion – Cobige's death was caused by her pre-existing heart condition and not any untreated abdominal pain.  In the same vein, Defendants also argue that Dr. Fintel's opinions do not go to a foreseeable harm.

Under *Daubert*, however, the Court's focus "must be solely on principles and methodology, not on the conclusions they generate."  *Daubert*, 509 U.S. at 595; *see also Winters v. Fru-Con Inc.,* 498 F.3d 734, 742 (7th Cir. 2007).  As is the case here, Dr. Fintel's "hypothetical explanation of the possible or probable causes of an event would aid the jury in its deliberations," and thus his testimony satisfies *Daubert's* relevancy requirement. *See Smith,* 215 F.3d 718-19; *see also Shepard v. State Auto. Mut. Ins., Co.,* 463 F.3d 742, 745 (7th Cir. 2006) ("causation is normally a question of fact for the jury.").  Last, Defendants' relevancy argument is also flawed because an "expert need not have an opinion on the ultimate question to be resolved by the trier of fact in order to satisfy" the relevancy requirement.  *Smith,* 215 F.3d at 718.  Therefore, Defendants' relevance argument is without merit.  Indeed, Dr. Fintel's testimony will assist the jury in determining whether Defendants' alleged failure to get Cobige medical treatment contributed to her suffering and death.  *See Pansier,* 576 F.3d at 737; Fed.R.Evid. 702.