**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MAURICE COBIGE, as Son, Next Friend, ) and Special Representative of the estate of ) PATRICIA COBIGE, Deceased, ) )           Plaintiff, ) )       v. ) ) CITY OF CHICAGO, a municipal ) corporation, *et al.*, ) )          Defendants. ) | Case No. 06 C 3807 |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On February 25, 2010, a jury rendered a verdict in favor of Plaintiff Maurice Cobige, Son, Next Friend, and Special Representative of the estate of Patricia Cobige, deceased, in the amount of $5 million dollars in compensatory damages against Defendant Chicago Police Officers. More specifically, the jury awarded $2 million dollars in compensatory damages for Plaintiff's Failure to Provide Medical Care claim brought pursuant to 42 U.S.C. § 1983 against Defendants Thomas Motzny, Rene Dimalanta, Julia Lawler, and Piotr Czarniecki and Plaintiff's state law Intentional Infliction of Emotional Distress ("IIED") claim against Defendants Motzny, Dimalanta, and Lawler. The jury also awarded an additional $3 million dollars for Plaintiff's Illinois Wrongful Death Act claim against Defendants Motzny, Dimalanta, and Lawler for the sum total of $5 million dollars in compensatory damages. The jury also awarded punitive damages against Defendants Motzny, Dimalanta, Lawler, and Czarniecki in the amount of $1,000.00 each on Plaintiff's Failure to Provide Medical Care claim. On the other hand, the jury found in favor of Defendant Civilian Detention Aide Maria Diaz and against Plaintiff on all

claims alleged against Diaz.  Before the Court is Defendant Officers' Motion for Judgment as a

Matter of Law and/or Motion for a New Trial Pursuant to Federal Rules of Civil Procedure 50(b)

and 59(a).[1]  For the following reasons, the Court denies Defendants' motions.

## LEGAL STANDARDS

### I.    Judgment As a Matter of Law Pursuant to Rule 50(b)

In assessing a motion under Rule 50(b), courts view the evidence and all reasonable

inferences in a light most favorable to the party who prevailed under the verdict and do not make

credibility determinations or weigh the evidence.  *See Reeves v. Sanderson Plumbing Prods.,*

*Inc.,* 530 U.S. 133, 150-51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Tate v. Executive Mgmt.*

*Servs., Inc.*, 546 F.3d 528, 531-32 (7th Cir. 2008) ("Once a jury has spoken, we are obliged to

construe the facts in favor of the parties who prevailed under the verdict.").  In deciding whether

judgment as a matter of law is appropriate, courts must consider the totality of the evidence to

determine whether the jury was presented with a "legally sufficient amount of evidence from

which it could reasonably derive its verdict."  *Massey v. Blue Cross-Blue Shield of Ill.*, 226 F.3d

922, 924 (7th Cir. 2000).  As the Seventh Circuit has noted, "the standard is steep.  A verdict will

be set aside as contrary to the manifest weight of the evidence only if no rational jury could have

rendered the verdict."  *Staub v. Proctor Hosp.*, 560 F.3d 647, 658 (7th Cir. 2009) (citations

omitted).

---

[1]  Defendants originally filed the present post-trial motions on March 23, 2010, but failed
to cite to the trial transcript or include the trial transcript as an attachment to their motions and
legal memoranda.  The Court thus directed Defendants to amend their motions by adding
citations to the trial transcript.  The Court then reset the briefing schedule.  As such, Defendants'
post-trial motions have been fully briefed since September 16, 2010.

## II.     New Trial Pursuant to Rule 59(a)

In the alternative, Defendants seek a new trial pursuant to Rule 59(a).  In ruling on a

motion for new trial, courts determine whether "the verdict is against the weight of the evidence,

the damages are excessive, or if for other reasons the trial was not fair to the moving party."

*Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 440 (7th Cir. 2010) (citation omitted).  A

verdict will be set aside as contrary to the manifest weight of the evidence only if "no rational

jury" could have rendered the verdict.  *See Moore ex rel. Estate of Grady v. Tuelja*, 546 F.3d

423, 427 (7th Cir. 2008).  More specifically, federal courts will not "set aside a jury verdict if a

reasonable basis exists in the record to support the verdict, viewing the evidence in the light most

favorable to the prevailing party, and leaving issues of credibility and weight of evidence to the

jury."  *Id.*; *Smith v. Northeastern Ill. Univ.,* 388 F.3d 559, 569 (7th Cir. 2004) ("party seeking to

reverse a district court's denial of a motion for a new trial bears a particularly heavy burden")

(citation omitted).

## BACKGROUND

On June 10, 2006, Chicago police officers arrested decedent Patricia Cobige.  (R. 351-1,

Trial Tr., at 649.)  At approximately 12:30 p.m., the police officers transported Cobige to the

25th District Police Station because it has a women's lockup.  (*Id.* at 654, 1297.)  Once in lockup

at the 25th District Police Station, trial evidence revealed that Cobige was in pain.  (*Id*. at 47.)

Specifically, Cobige's cellmate, Barbara Flores, testified at trial that when Cobige was first in

lockup she appeared to be sick and that she was slumped over and moaning.  (*Id*. at 47-48.)

Flores further testified that Cobige told the jail guards at least a dozen times that she was sick,

needed to see a doctor, and needed to go to the hospital.  (*Id.* at 51, 74.)

Furthermore, Flores testified that on the following day, June 11, 2006, she heard Cobige ask the jail guards if she could go to the hospital at least three times. (*Id*. at 52.) Again, Flores testified that Cobige looked sick and that she was slumped over. (*Id*.) Flores also testified that Cobige told Defendant Officer Lawler that she was sick, but that Officer Lawler ignored her. (*Id*. at 53.) Flores further explained that the police officers then handcuffed them for bond court and she was handcuffed to Cobige. (*Id*. at 54.) Flores testified that at that time Cobige had trouble walking to the police wagon and that she held Cobige's arm to help her walk. (*Id*. at 55.)

Flores also testified that Defendant Officers Dimalanta and Czarniecki transported the women to bond court. (*Id.* at 56, *see also id*. at 97.) While waiting outside of the police wagon, Officer Dimalanta told the women that "if anyone complains that you're sick or injured, I'm not going to take you to the hospital. I'm just going to bring you back here. Our goal is to get to court, get our bonds and get out." (*Id*. at 57.) Officers Dimalanta and Czarniecki then transported the women to the Cook County Courthouse at 26th Street and California Avenue. (*Id*., *see also id.* at 101.) Once in the court's lockup, Flores observed that Cobige was doubled over. (*Id.* at 58.) Also, Flores testified that Cobige told a guard that she had to go to the hospital. (*Id*.)

At trial, Cook County Deputy Sheriff Patrina McCoy testified that she had worked at the criminal courts building at 26th and California on June 11, 2006. (*Id.* at 231.) Deputy McCoy testified that while she was screening the women for bond court, she noticed that something was wrong with Cobige. (*Id.* at 232-33.) Further, Deputy McCoy testified that Cobige told her that her stomach hurt and that she felt like her stomach was bleeding. (*Id*. at 234-35.) Deputy McCoy then asked Cobige if she wanted medical attention, but Cobige said no and that she

wanted to see the judge. (*Id.* at 236.) Deputy McCoy then sent Cobige out with Cook County Sheriff's Deputy Ariel Lindsey. (*Id.* at 238.)

Deputy Lindsey testified that she worked on June 11, 2006 and that Deputy McCoy explained Cobige's situtation to her. (*Id.* at 323, 327.) Deputy Lindsey also testified that when she asked Cobige how she was, Cobige replied that her stomach was hurting and that she felt like her insides were bleeding. (*Id.* at 328-29.) After that, Deputy Lindsey told Cobige that they were not going to bond court. (*Id.* at 329.) While Cobige was walking back, she was hunched over holding her side. (*Id.* at 329-33.) Deputy Lindsey then returned Cobige and her paperwork to a Chicago police officer because Cobige needed a medical clearance for bond court. (*Id.* at 331, 336.) Furthermore, Deputy Lindsey testified that she told Cobige to tell the police officer that she felt like her stomach or insides were bleeding. (*Id.* at 337.) Cobige then told the Chicago police officer that she felt like her insides were bleeding. (*Id.* at 339.)

Although Deputy Lindsey did not identify Officer Dimalanta as the police officer to whom she turned Cobige over, Officer Dimalanta testified that while he was at the criminal courts building on June 11, 2006, a deputy called out his district and turned Cobige and her paperwork over to him. (*Id.* at 1175-77.) Thereafter, Officer Dimalanta explained to Officer Czarniecki why the bond court rejected Cobige. (*Id.* at 106-08.) At trial, Defendant Sergeant Motzny testified that Officer Dimalanta called him shortly thereafter and told him that the bond court had rejected Cobige for a medical reason. (*Id.* at 1257-58.) Sergeant Motzny further testified that he told Officer Dimalanta that if Cobige was sick, Officer Dimalanta should take her to the hospital. (*Id.* at 1258-59.) Officers Dimalanta and Czarniecki, however, did not take Cobige to the hospital, but returned her to the 25th District Police Station. (*Id.* at 109-10, 1191.)

Officer Dimalanta testified that when they returned from bond court he told either Officer Lawler or Defendant Civilian Detention Aide Maria Diaz that the bond court had rejected Cobige for medical reasons. (*Id*.)

At trial, Diaz testified that she worked at the 25th District women's lockup on June 11, 2006 from 6:00 a.m. until 2:00 p.m., and she was there when Cobige returned from bond court. (*Id*. at 558-59.) Diaz testified that Officer Dimalanta took off Cobige's handcuffs and told her that Cobige had stomach cramps. (*Id*. at 577.) Diaz also observed that Cobige was bent over. (*Id*. at 627.) Further, Officer Lawler testified that Officer Dimalanta explained to her that Cobige had been rejected from bond court because of her stomach cramps. (*Id*. at 917.) Further, Diaz testified that she tried to get Cobige medical assistance because the bond court had rejected her due to a medical reason and that Cobige needed a medical screening to go back to bond court the next day. (*Id*. at 559-60, 583.) Diaz also testified that she told Officer Lawler two times to call Defendant Sergeant Motzny about Cobige needing a medical clearance. (*Id*. at 560-62, 664.) Thereafter, Officer Lawler informed Diaz that Sergeant Motzny was not going to send Cobige to the hospital. (*Id*. at 586, 665.) In fact, no one took Cobige to the hospital during the 6:00 a.m. to 2:00 p.m. shift on June 11, 2006. (*Id*. at 586.) Meanwhile, Sergeant Motzny, who admitted that he was in charge of lockup on June 11, 2006, never checked on Cobige while she was in lockup that day even though he was repeatedly informed that Cobige was in pain. (Trial Tr. at 1256-57, 1260.)

After talking to Officer Lawler, Diaz monitored Cobige for the remainder of her 6:00 a.m. to 2:00 p.m. shift. (*Id*. at 589-91.) Near the end of her shift, Cobige told Diaz that her pains were getting worse. (*Id*. at 595-96, 604-05.) Diaz then told Officer Lawler to call Sergeant

Motzny because Cobige's stomach pains were getting worse. (*Id*. at 596, 606.) Officer Lawler attempted to call Sergeant Motzny, but did not reach him. (*Id*. at 607.) At the end of her shift, Diaz informed the police officer replacing her about Cobige's situation, namely, that Cobige was sick and needed medical attention. (*Id*. at 611-12, 615-17.) Diaz specifically stated to the replacing officer that she hoped the afternoon sergeant would "do the right thing." (*Id*. at 633.) Officer Lawler, on the other hand, admitted that she did not inform the third shift that Cobige needed to go the hospital for her stomach pains or clearance for bond court the next day. (*Id*. at 1003, 1094.) When Diaz returned to work on Monday, June 12, 2006, she found out that Cobige had died in lockup. (*Id*. at 672.) Indeed, Civilian Detention Aide Priscilla Jones testified that she found Cobige dead on the floor of her cell at approximately 1:20 a.m. on June 12, 2006. (*Id*. at 392, 444.)

## ANALYSIS

### I. Motion for Judgment as a Matter of Law

#### A. Failure to Provide Medical Care Claim

Defendants first argue that there was insufficient evidence that Officers Lawler's, Motzny's, Dimlanta's, and Czarniecki's failure to provide Cobige with medical care was objectively unreasonable.[2] To establish Plaintiffs' Fourth Amendment denial of medical care claim, Plaintiff had the burden of proving by the preponderance of the evidence that (1) Defendants' failure to provide Cobige with medical care was objectively unreasonable under the

---

[2] Although the facts underlying Plaintiff's conditions of confinement claim occurred while Cobige was a pretrial detainee, there had been no judicial determination of probable cause before her death. Accordingly, the applicable standard for Plaintiff's Failure to Provide Medical Care claim is pursuant to the Fourth Amendment. *See Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007); *Lopez v. City of Chicago,* 464 F.3d 711, 718-19 (7th Cir. 2006).

circumstances, and (2) Defendants' conduct caused Cobige harm. *See Williams v. Rodriguez,* 509 F.3d 392, 403 (7th Cir. 2007); *Lopez v. City of Chicago,* 464 F.3d 711, 718-19 (7th Cir. 2006). Certain factors guide courts in what constitutes objectively unreasonable conduct in the context of a medical needs case, including: (1) whether the officer was aware of the arrestee's medical need; (2) the seriousness of the medical need balanced against the requested treatment; and (3) any police interests.[3] *See Williams,* 509 F.3d at 403; *Sides v. City of Champaign,* 496 F.3d 820, 828 (7th Cir. 2007).

Defendants specifically frame their argument as a personal involvement argument, namely, that the individual Defendant Officers were not sufficiently involved in the constitutional deprivation. To clarify, to recover damages under Section 1983, a plaintiff must establish that the individual defendant was personally responsible for the constitutional violation. *See Minix v. Canarecci,* 597 F.3d 824, 834 (7th Cir. 2010); *Knight v. Wiseman,* 590 F.3d 458, 462-63 (7th Cir. 2009). Specifically, a "plaintiff bringing a civil rights action must prove that the defendant personally participated in or caused the unconstitutional actions." *Grieveson v. Anderson,* 538 F.3d 763, 776 (7th Cir. 2008) (citation omitted). Moreover, "a supervisor is not liable for the acts of her subordinates under § 1983 unless she was aware of and approved her employees' conduct." *Sides,* 496 F.3d at 827; *see also Minix,* 597 F.3d at 834 (supervisor must have condoned or acquiesced in subordinate's unconstitutional treatment).

---

[3] Although Defendants argue that the police officers were not involved in the deprivation of Cobige's constitutional rights and downplay the seriousness of Cobige's medical condition, Defendants do not address Plaintiff's argument that there were no countervailing police interests at issue. *See Williams v. Rodriguez,* 509 F.3d 392, 403 (7th Cir. 2007); *Sides v. City of Champaign,* 496 F.3d 820, 828 (7th Cir. 2007).

### 1.   Officer Lawler's Involvement

Construing the facts and all reasonable inferences in a light most favorable to Plaintiff – who prevailed under the verdict –  and considering the totality of the evidence, there is a legally sufficient amount of evidence from which the jury could have reasonably derived its verdict against Officer Lawler.  *See Wallace v. McGlothan,* 606 F.3d 410, 418 (7th Cir. 2010); *Thomas v. Cook County Sheriff's Dep't,* 604 F.3d 293, 301 (7th Cir. 2010).  Specifically, evidence that Officer Lawler personally participated in the constitutional deprivation at issue includes Cobige's cellmate Flores' testimony that on June 11, 2006, Cobige told Defendant Officer Lawler that she was sick, but that Officer Lawler ignored her.  At that time, Flores testified that Cobige was slumped over and moaning.  Trial evidence also reveals that Officer Dimalanta told Officer Lawler that the bond court rejected Cobige for medical reasons, in particular, that Cobige had stomach cramps.  Furthermore, Detention Aide Diaz testified that she told Officer Lawler two times to call Defendant Sergeant Motzny about Cobige needing a medical clearance and that Officer Lawler informed Diaz that Sergeant Motzny was not going to send Cobige to the hospital.  Near the end of her shift, Cobige told Diaz that her pains were getting worse after which Diaz told Officer Lawler to call Sergeant Motzny about Cobige's pain.

Based on these facts, Officer Lawler was aware that Cobige was suffering from abdominal pain and that the bond court had rejected her for medical reasons.  Officer Lawler also knew that Cobige's pains were getting worse at the end of her shift.  In addition, the undisputed evidence in the record shows that Officer Lawler did not inform the third shift on June 11, 2006 that Cobige needed to get to the hospital for her stomach pains and clearance for bond court the next day.  Instead, trial testimony shows that Officer Lawler diminished Cobige's need for

medical attention for her abdominal pain, which Officer Lawler referred to as stomach cramps that women get every month. (Trial Tr. at 918.) Despite Officer Lawler's characterization of Cobige's pain, she admitted at trial that she documented Cobige's medical condition in the appropriate log and that she only documented severe medical conditions in this manner. (*Id*. at 890, 1001.) Meanwhile, Defendants' argument that Officer Lawler's own testimony concerning Cobige's medical condition conflicts with other trial testimony does not save the day because "[w]hen faced with conflicting, or even inconsistent testimony, the jury is free to believe one side over another." *See Thomas,* 604 F.3d at 302.

Viewing these facts and all reasonable inferences in Plaintiff's favor, Defendants have failed to demonstrate that no rational jury could have rendered a verdict against Officer Lawler. *See Maher v. City of Chicago,* 547 F.3d 817, 824 (7th Cir. 2008) (movant has "a 'heavy burden' in making such a claim: he must demonstrate that 'no legally sufficient evidentiary basis' existed for the jury's verdict."). In other words, Defendants have failed to establish that there was no basis for the jury's verdict that Officer Lawler's conduct was objectively unreasonable under the circumstances. *See Williams*, 509 F.3d at 403.

### 2. Sergeant Motzny's Involvement

Next, Defendants maintain that Plaintiff failed to present legally sufficient evidence from which the jury could reasonably derive its verdict against Sergeant Motzny. *See Maher,* 547 F.3d at 824 (courts must leave judgments undisturbed unless moving party can establish no rational jury could have rendered the verdict). Considering the evidence as a whole – and viewing it and all reasonable inferences in Plaintiff's favor – the jury could have reasonably concluded that Plaintiff presented legally sufficient evidence that Sergeant Motzny was

personally involved in the deprivation of Cobige's constitutional rights.

At trial, Sergeant Motzny testified that Officer Dimalanta called him on June 11, 2006 and told him that the bond court had rejected Cobige for a medical reason. Trial testimony also revealed that Officer Lawler informed Sergeant Motzny of Cobige's medical condition at least twice after which Sergeant Motzny decided not to send Cobige to the hospital. Officer Lawler specifically testified at trial that Sergeant Motzny refused to send Cobige to the hospital and said that the third shift would do it. (Trial Tr. at 921-22.) Meanwhile, Sergeant Motzny did not provide Cobige with any medical treatment. Finally, although Sergeant Motzny testified that he thought Cobige "appeared normal" when she returned from bond court, other testimony in the record reveals that Cobige was slouching and holding her stomach at that time. (*Id.* at 628, 630, 1302.)

Thus, not only was Sergeant Motzny aware of Cobige's medical condition, namely, her abdominal cramps, but he made the decision not to send Cobige to the hospital despite her serious medical condition. Under these circumstances – viewed in Plaintiff's favor – Sergeant Motzny participated in and condoned the deprivation of Cobige's constitutional rights. *See Grieveson,* 538 F.3d at 776; *see also Minix,* 597 F.3d at 834. Accordingly, Defendants have failed in their "heavy burden" of establishing that no rational jury would have found for Plaintiff and against Sergeant Motzny because trial evidence supports the conclusion that Sergeant Motzny's conduct was objectively unreasonable under the circumstances. *See Maher,* 547 F.3d at 824; *Williams,* 509 F.3d at 403.

### 3. Officer Dimalanta's and Czarniecki's Involvement

Similarly, there is legally sufficient evidence in the trial record that Officers Dimalanta and Czarniecki were aware of Cobige's serious medical condition and participated in the deprivation of her constitutional rights. Specifically, Cobige's cellmate Flores testified that prior to going to bond court, Cobige had trouble walking to the police wagon and that she held Cobige's arm to help her walk. Flores further testified that Officers Dimalanta and Czarniecki transported the women to bond court. After the bond court rejected Cobige, Deputy Lindsey returned Cobige and her paperwork to a Chicago police officer. Deputy Lindsey testified that she told Cobige to tell the police officer that she felt like her stomach or insides were bleeding and Cobige then told the Chicago police officer that she felt like her insides were bleeding. Although Deputy Lindsey did not identify Officer Dimalanta as the police officer to whom she turned Cobige over, Officer Dimalanta testified that while he was at the criminal courts building on June 11, 2006, a deputy called out his district and turned Cobige and her paperwork over to him. Officer Dimalanta then explained to Officer Czarniecki why the bond court rejected Cobige. Also, Sergeant Motzny testified that Officer Dimalanta called him shortly thereafter and told him that the bond court had rejected Cobige for her abdominal cramps. Sergeant Motzny further testified that he told Officer Dimalanta that if Cobige was sick, Officers Dimalanta and Czarniecki should take her to the hospital. Officers Dimalanta and Czarniecki, however, did not take Cobige to the hospital or provide her with any medical treatment, but instead returned her to the 25th District Police Station.

Viewing this evidence and all reasonable inferences in Plaintiff's favor, *see Reeves*, 530 U.S. at 150-51, Plaintiff presented legally sufficient trial evidence that Officers Dimalanta and

Czarniecki were aware of Cobige's serious medical condition, namely, that she felt like her insides were bleeding, and that bond court had rejected her for medical reasons. Moreover, even though Sergeant Motzny directed Officers Dimalanta and Czarniecki to take Cobige to the hospital if she was sick, they failed to do so. Under these circumstances, Defendants have failed in their heavy burden of establishing that no rational jury could have rendered the verdict in Plaintiff's favor because trial evidence supports the conclusion that Officers Dimalanta's and Czarniecki's conduct was objectively unreasonable under the circumstances. *See Staub*, 560 F.3d at 658; *Lopez,* 464 F.3d at 718-19.

### 4. Causation Evidence

Next, Defendants argue that there was insufficient trial evidence that Cobige's abdominal pains caused her death, and thus Plaintiff did not provide legally sufficient evidence to establish the second element under *Lopez*, namely, that Defendants' conduct in failing to provide Cobige medical treatment caused her harm. *See id*. at 718-19. In short, Defendants are challenging Plaintiff's expert medical witness Dr. Dan Fintel's opinion testimony.

At trial, Dr. Fintel, who is the director of coronary care at Northwestern Memorial Hospital, testified that based on his review of the records, including the postmortem examination, Cobige had significant episodes of abdominal pain prior to her death and that these waves of abdominal pain lasted for a significant period during her incarceration in June 2006. (Trial Tr. at 830, 832.) Dr. Fintel also testified that Cobige suffered from a heart condition, ventricular hypertrophy, and that the unrelieved abdominal pain caused adrenaline to bombard her heart causing an arrhythmia that led to Cobige's death. (*Id*. at 822-23.) Further, Dr. Fintel testified that if Cobige had been taken to the hospital, based on her history and symptoms, the

health care providers would have routinely examined her and given her blood tests that would have revealed her heart problem. (*Id*. at 839-42.) At that point, Dr. Fintel opined that a pain medication would have helped reduce her pain and that had Cobige received appropriate testing and treatment near the time of her pain, this treatment would have "dramatically reduced the chance that these painful episodes would have resulted in the sudden death the she experienced." (*Id*. at 842-44.) The jury also heard the testimony of Defendants' medical expert, Dr. Peter Santucci, who agreed with many of Dr. Fintel's opinions, including that Cobige suffered from intermittent abdominal pain throughout her incarceration. (*See* Trial Tr. at 986.)

Here, Defendants argue that Dr. Fintel's opinion is flawed because he relied upon evidence concerning Cobige's medical condition at bond court which was hours before jail staff found her dead on the floor of her cell at the 25th District lockup. Defendants specifically argue that Dr. Fintel's testimony belies his other testimony that Cobige's significant abdominal pain would have had to occur within minutes or seconds of her death to have caused the arrhythmia. Despite Dr. Fintel's reliance on Cobige's medical condition at bond court, the trial record – and the record upon which Dr. Fintel relied for his expert opinion – also evidences that Cobige suffered intermittent waves of abdominal pain throughout her incarceration in June 2006 and that her pain got worse preceding her death. As such, viewing the evidence and all reasonable inferences in Plaintiff's favor, Defendants have failed to establish that there was legally insufficient evidence as to Dr. Fintel's causation testimony. *See Staub*, 560 F.3d at 658.

In sum, because there was legally sufficient trial evidence that Defendants' failure to provide Cobige with medical care was objectively unreasonable under the circumstances and that Defendants' conduct caused Cobige harm, *see Lopez,* 464 F.3d at 718-19, the Court denies

Defendants' Rule 50(b) motion as to Plaintiff's Failure to Provide Medical Care claim pursuant to the Fourth Amendment.

**B.** **Intentional Infliction of Emotional Distress ("IIED") Claim**

Next, Defendants assert that there was insufficient evidence to support Plaintiff's IIED claim against Defendant Officers Motzny, Lawler, and Dimalanta. To establish a claim of IIED under Illinois law, a plaintiff must prove that: "(1) the defendants' conduct was extreme and outrageous; (2) the defendants knew that there was a high probability that their conduct would cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress." *Swearnigen-El v. Cook County Sheriff's Dep't,* 602 F.3d 852, 864 (7th Cir. 2010) (citing *Kolegas v. Heftel Broad. Corp.,* 154 Ill.2d 1, 180 Ill.Dec. 307, 607 N.E.2d 201, 211 (1992)). "To meet the 'extreme and outrageous' standard, the defendants' conduct "must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Id*. (quoting *Kolegas,* 154 Ill.2d at 21); *see also Fox v. Hayes,* 600 F.3d 819, 842 (7th Cir. 2010). The Supreme Court of Illinois has recognized three factors for courts to consider when evaluating whether conduct is extreme and outrageous: (1) "the more power or control the defendant has over the plaintiff, the more likely the conduct will be deemed extreme;" (2) "whether the defendant reasonably believed its objective was legitimate;" and (3) "whether the defendant was aware the plaintiff was 'peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity.'" *Franciski v. University of Chicago Hosp.,* 338 F.3d 765, 769 (7th Cir. 2003) (quoting and citing *McGrath v. Fahey,* 126 Ill.2d 78, 127 Ill.Dec. 724, 533 N.E.2d 806 (1988)); *see also Fox,* 600 F.3d at 840; *Lewis v. School Dist. #70,* 523 F.3d 730, 747 (7th Cir. 2008).

Trial evidence establishes that Defendants had complete authority over Cobige because she was incarcerated as a pretrial detainee at the 25th District Police Station lockup. *See Franciski*, 338 F.3d at 769; *see also Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed. 2d 251 (1976) (basic constitutional principles "establish the government's obligation to provide medical care for those whom it is punishing by incarceration."). Also, the evidence and all reasonable inferences taken in a light most favorable to Plaintiff demonstrates that Defendant Officers knew Cobige was susceptible to emotional stress due to her severe abdominal pain and repeated requests for medical care. Cobige, for example, told Officer Dimalanta that she felt like she was bleeding inside and Officer Dimalanta knew that the bond court had rejected Cobige for medical reasons, yet Officer Dimalanta did not take Cobige to the hospital after bond court. In fact, Officer Dimalanta stated to the women in lockup prior to going to bond court that "if anyone complains that you're sick or injured, I'm not going to take you to the hospital. I'm just going to bring you back here." Trial testimony also indicates that Cobige was slumped over in pain when Officer Dimlanta took the women in lockup to bond court in the first instance.

In addition, Officer Lawler was on notice of Cobige's continued pain throughout her shift on July 11, 2006. Despite Cobige's repeated requests for medical help, Officer Lawler remained indifferent to Cobige's needs and did nothing to alleviate her pain. Also, Officer Lawler repeatedly told Sergeant Motzny that Cobige had stomach pain and cramps and that she needed to go to the hospital, yet Sergeant Motzny did not authorize any such treatment. In fact, Sergeant Motzny, who admitted that he was in charge of lockup, never checked on Cobige while she was in lockup on June 11, 2006, after his staff informed him that Cobige was experiencing significant pain. Therefore, there is a legally sufficient basis in the trial record that Defendant Officers

Dimalanta, Lawler, and Motzny knew Cobige was susceptible to emotional stress due to her pain and requests for care while she was incarcerated in the 25th District Police Station lockup. *See McGrath,* 126 Ill.2d at 90 ("Behavior which (though rude, abrasive or extremely inconsiderate) may not otherwise be actionable may be deemed outrageous if the defendant knows that the plaintiff is peculiarly susceptible to emotional distress.").

Based on these facts and circumstances, Defendants have failed to establish that no rational jury could have concluded that their repeated denial of medical care and indifference to Cobige's pain was extreme and outrageous. *See Pavlik v. Kornhaber,* 326 Ill.App.3d 731, 745-46, 260 Ill.Dec. 331, 761 N.E.2d 175 (Ill. 2001) ("repetition of the behavior may be a critical factor in raising offensive acts to actionably outrageous ones").

Under the second element of an IIED claim under Illinois law, Plaintiff was required to present evidence at trial that Defendants either intended that their conduct would cause severe emotional distress or that they had a reckless disregard of the probability of causing emotional distress. *See Lewis,* 523 F.3d at 746; *Hunt-Golliday v. Metropolitan Water Reclamation Dist.,* 104 F.3d 1004, 1016 (7th Cir. 1997). In determining whether a defendant had a reckless disregard of the probability that his conduct would cause emotional distress, the Supreme Court of Illinois has held that "[l]iability extends to situations in which there is a high degree of probability that severe emotional distress will follow and the actor goes ahead in conscious disregard of it." *Public Fin. Corp. v. Davis,* 66 Ill.2d 85, 90, 4 Ill.Dec. 652, 360 N.E.2d 765 (Ill. 1976). Indeed, as the Seventh Circuit teaches, "[c]ourts have generally found this element to be satisfied either when a defendant's actions, by their very nature, were likely to cause severe distress or when the defendant knew that a plaintiff was particularly susceptible to such distress

and that, because of this susceptibility, the defendants actions were likely to cause it to occur."
*Honaker v. Smith,* 256 F.3d 477, 494 (7th Cir. 2001).

Construing the trial evidence in Plaintiff's favor and considering the totality of the evidence, there is a legally sufficient amount of trial evidence from which the jury could reasonably conclude that Defendant Officers Lawler, Motzny, and Dimalanta knew that their reckless disregard for Cobige's serious medical need, namely, her abdominal pain and cramps, would likely cause severe and emotional distress. *See Honaker,* 256 F.3d at 494. To clarify, Defendant Officers' refusal to provide Cobige with any medical treatment for her serious medical need had the high probability of causing her severe emotional distress especially because she was incarcerated and could not seek help on her own. *See id.*; *see also Public Finance Corp.,* 66 Ill.2d at 90 ("reckless conduct which will support a cause of action" if it is "conduct from which the actor knows severe emotional distress is certain or substantially certain to result"). This is especially true because the evidence supports that Cobige's condition progressively worsened while she was incarcerated, yet Defendants failed to give her any medical treatment.

Under the last IIED element under Illinois law, Plaintiff was required to present trial evidence demonstrating that Defendant Officers' conduct caused Cobige's severe emotional distress. *See Honaker,* 256 F.3d at 495 ("third element of the tort focuses on the severity of the emotional distress"). Although Cobige could not testify on her own behalf as to the severe emotional distress she suffered, "Illinois cases have noted the principle," that "in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed." *Id.* at 496 (citations omitted). "These cases have acknowledged that,

even when significant evidence was not presented as to the severity of distress, the very nature of the conduct involved may be evidence of its impact on the victim." *Id.* As such, Illinois courts tend to "merge the issue of the outrageousness of the defendant's conduct with the issue of the severity of the plaintiff's emotional distress, in effect requiring more evidence of outrageousness the weaker the evidence of distress." *Id.* (quoting *Bristow v. Drake Street, Inc.,* 41 F.3d 345, 350 (7th Cir. 1994)).

As discussed, Defendant Officers had complete control over Cobige before she died in the 25th District Station's lockup and Cobige was susceptible to emotional distress due to Defendants' complete control over her and her severe abdominal pain that she could not remedy on her own. *See Kolegas,* 154 Ill.2d at 25 (facts supporting "outrageous character of the defendants' conduct are sufficient to support the additional allegation that the plaintiffs suffered severe emotional distress as a result of that conduct."). Despite these circumstances, Defendant Officers ignored Cobige's repeated requests for medical treatment and denied Cobige routine medical care that could have saved her life. In light of the totality of the evidence, Defendants have failed to show that no rational jury could have rendered the verdict in favor of Plaintiff and against Defendant Officers Motzny, Lawler, and Dimlanta as to Plaintiff's IIED claim. *See Staub,* 560 F.3d at 658. The Court thereby denies Defendants' Rule 50(b) motion as this claim.

### C.     Illinois Wrongful Death Act Claim

Defendants also argue in their post-trial motion that there was insufficient evidence to support Plaintiff's Illinois Wrongful Death Act claim. *See* 740 ILCS 180/1. To establish an Illinois Wrongful Death Act claim, Plaintiff was required to show that: "(1) defendant[s] owed a duty to decedent; (2) defendant[s] breached that duty; (3) the breach of duty proximately caused

decedent's death; and (4) pecuniary damages arising therefrom to persons designated under the Act." *Thompson v. City of Chicago,* 472 F.3d 444, 457 (7th Cir. 2006) (citation omitted); *see also Bovan v. American Family Life Ins. Co.,* 386 Ill.App.3d 933, 938, 325 Ill.Dec. 40, 897 N.E.2d 288 (Ill. 2008).

In their post-trial motion, Defendants do not articulate how Plaintiff failed to present legally sufficient evidence fulfilling the elements of an Illinois Wrongful Death Act claim. Instead, Defendants argue that Plaintiff failed to present evidence that Defendant Officer Dimlanta's, Lawler's, and Motzny's actions were willful and wanton as required under the Illinois Local Governmental and Governmental Employees Tort Immunity Act ("Tort Immunity Act"). *See Williams,* 509 F.3d at 404-05 (Illinois statute provides immunity for public employees). The Tort Immunity Act states, in relevant part:

> Neither a local public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but this Section shall not apply where the employee, acting within the scope of his employment, knows from his observation of conditions that the prisoner is in need of immediate medical care and, through willful and wanton conduct, fails to take reasonable action to summon medical care.

740 ILCS 10/4-105. Willful and wanton conduct "means a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210; *see also Murray v. Chicago Youth Ctr.,* 224 Ill.2d 213, 235, 309 Ill.Dec. 310, 864 N.E.2d 176 (Ill. 2007).

Viewing the evidence and all reasonable inferences in Plaintiff's favor, the trial record reveals that Officers Dimilanta, Lawler, and Motzny consciously disregarded Cobige's serious

medical condition and her requests for medical care many times throughout Cobige's incarceration. In particular, these officers knew of Cobige's abdominal pains well before Cobige died, yet they took no action to help her. *See Luss v. Village of Forest Park,* 377 Ill.App.3d 318, 337-38, 316 Ill.Dec. 169, 878 N.E.2d 1193 (Ill. 2007). Indeed, Defendant Officers' conscious disregard of Cobige's health and safety is evidenced by Officer Lawler's failure to notify the third shift that Cobige needed to go to the hospital, Officer Dimalanta's failure to take Cobige to the hospital after the bond court had rejected her for medical reasons, and Sergeant Motzny's failure to identify Cobige as a sick detainee who needed to go to the hospital to the sergeant relieving him. (Trial Tr. at 1276.) In fact, Sergeant Motzny did not even tell his watch commander that the bond court had rejected Cobige based on medical reasons. (*Id*. at 1277.)

Based on the totality of the evidence, Defendants have failed in their burden of establishing that no rational jury could have found in favor of Plaintiff and against Defendant Officers as to their willful and wanton conduct based on their conscious disregard of Cobige's health and safety. *See Thomas*, 604 F.3d at 301. Because the jury had a legally sufficient evidentiary basis for its verdict, the Court denies Defendants' Rule 50(b) motion as to Plaintiff's Illinois Wrongful Death Act claim.

## II.     Motion for a New Trial

### A.     Excessive Verdict

In their motion for a new trial, Defendants argue that the jury's verdict was "monstrously excessive," and thus the Court should either vacate or reduce the $5 million compensatory damages award. When reviewing an award for compensatory damages, the Court must look to

three considerations:  (1) whether the award is monstrously excessive;[4] (2) whether there is no rational connection between the award and the evidence; and (3) whether the award is roughly comparable to awards made in similar cases.  *See Fox*, 600 F.3d at 845; *Deloughery v. City of Chicago,* 422 F.3d 611, 619 (7th Cir. 2005).  A "court should not substitute a jury's damages verdict with its own figure merely because ... a plaintiff in a similar case was perhaps not able to plead his facts to the jury as well."  *Thomas*, 604 F.3d at 313 (citation omitted).  Moreover, "when considering a motion for remittitur, the trial court must accord proper deference to the jury's verdict."  *O'Sullivan v. City of Chicago,* 474 F.Supp.2d 971, 982 (N.D. Ill. 2007); *see also American Nat'l Bank & Trust Co. of Chicago v. RTA,* 125 F.3d 420, 437 (7th Cir. 1997) ("Because damage calculations are essentially an exercise in factfinding, our review of the jury's damage award is deferential.").

In their motion, Defendants argue that the Court should vacate or remit the compensatory damages award of $5 million because no rational connection exists between the award and the evidence.  Defendants, however, do not legally develop their argument or cite to the record in support of this argument.  Instead, Defendants merely direct the Court's attention to their arguments made in support of their Rule 50(b) motion.  Nevertheless, despite Defendants' argument to the contrary, there was sufficient evidence in the trial record to support the award of $5 million.  Cobige was a 46-year-old woman who died of a treatable illness while she was in custody at the 25th District Police Station lockup.  Testimony establishes that both Cobige and

_____

[4]  The Seventh Circuit recognizes that "the 'monstrously excessive' inquiry is a vague one that may simply be another way of asking whether there is a rational connection between the award and the evidence."  *Harvey v. Office of Banks & Real Estate,* 377 F.3d 698, 713-14 (7th Cir. 2004).

her cellmate requested medical help for Cobige on the day of her arrest, June 10, 2006. Other trial testimony indicates that the following day, Defendant Officers were aware of Cobige's severe abdominal cramps and her requests to go to the hospital, yet ignored Cobige and her requests. Other trial evidence reveals that Cobige suffered severe pain throughout her incarceration until she died on the floor of her cell. *See Thomas,* 604 F.3d at 313-14.

Moreover, Cobige's son, Maurice Cobige, testified to his Illinois Wrongful Death Act loss of society damages. *See Pleasance v. City of Chicago,* 396 Ill.App.3d 821, 827-28, 336 Ill.Dec. 363, 920 N.E.2d 572 (Ill. 2009) (loss of society damages include deprivation of love, companionship, and affection from decedent). Specifically, Maurice testified that his mother was a very loving person, who was outgoing and family-oriented. (Trial Tr. at 1334.) He also testified that when he was little, Patricia Cobige took him to the movies and swimming and loved to play cards with him. (*Id*. at 1335.) He stated that his mother loved to cook for him and other family members. (*Id*. at 1335-56.) Maurice also testified that his mother was very protective of him and encouraged him to stay in school. (*Id*. at 1338.) As he became an adult, Maurice testified that his mother was his friend and that he could talk to her about anything. (*Id.* at 1340.)

Meanwhile, although Defendants failed to develop their argument that no rational connection exists between the award and the trial evidence, they argue that the jury's award was "simply based on passion and prejudice." Defendants base this argument on the fact that during their deliberations, the jury asked the Court via a written note how much Plaintiff's attorney asked them to award Plaintiff during closing arguments – to which the Court replied $5 million in compensatory damages and $1,000 in punitive damages. Thereafter, the jury returned a total of $5 million in compensatory damages and $1,000 in punitive damages. Defendants argue that

this is somehow suspicious and ask the Court to draw an inference in their favor that because Plaintiff's attorney asked for $5 million and the jury awarded this amount, the award was based on passion and prejudice. It is well-establish at this procedural posture, however, that the Court is required to draw all reasonable inferences in Plaintiff's favor. *See Thomas,* 604 F.3d at 300-01; *Tart v. Illinois Power Co.,* 366 F.3d 461, 472 (7th Cir. 2004). Moreover, the Court will not penalize Plaintiff because his counsel presented damages evidence and requested a certain amount of damages in closing arguments, whereas Defendants' counsel failed to address or refute Plaintiff's damages request during trial.

Next, Defendants fail to argue that the compensatory damages were excessive based on awards made in comparable cases. *See Thomas,* 604 F.3d at 313; *Fox,* 600 F.3d at 845. Nonetheless, the jury award of $2 million dollars in compensatory damages for Plaintiff's Section 1983 Failure to Provide Medical Care and IIED claims is not out of line with other Section 1983 serious medical needs verdicts, especially because Cobige suffered recurring and significant pain while incarcerated and that routine medical care could have saved her life. *See Thomas,* 604 F.3d at 313 ($4 million not excessive in case involving death of pretrial detainee); *Estate of Moreland v. Dieter,* 395 F.3d 747 (7th Cir. 2005) (jury awarded $29 million for Section 1983 claim based on inmate's death). In addition, Illinois courts have affirmed Wrongful Death Act compensatory awards for well over the $3 million awarded in this matter. *See, e.g., Colella v. JMS Trucking Co.,* 932 N.E.2d 1163, 1178 (Ill. 2010) (jury award of $8 million for loss of society not excessive); *Drews v. Gobel Freight Lines, Inc.,* 144 Ill.2d 84, 97, 578 N.E.2d 970, 161 Ill.Dec. 324, 330 (Ill. 1991) ($8.3 million loss of society damages award not excessive).

In sum, viewing the evidence and all reasonable inferences in Plaintiff's favor, Defendants have failed in their burden of establishing that the jury's damages award was excessive and that the Court should vacate or reduce it. *See Fox,* 600 F.3d at 845; *McNabola v. Chicago Transit Auth.,* 10 F.3d 501, 516 (7th Cir. 1993).

## B.      Failure to Provide Medical Care Standard

Defendants also argue that they are entitled to a new trial because the Court applied the wrong standard for evaluating Plaintiff's Failure to Provide Medical Care claim. To clarify, although the facts underlying Plaintiff's conditions of confinement claim occurred while Cobige was a pretrial detainee, there had been no judicial determination of probable cause before her death. Thus, under such circumstances, the Court concluded that the objectively reasonable standard of the Fourth Amendment applied to Plaintiff's Failure to Provide Medical Care claim. *See Lopez,* 464 F.3d at 718-19. As the *Lopez* court explained:

> [W]e have held that the Fourth Amendment governs the period of confinement between arrest without a warrant and the preliminary hearing at which a determination of probable cause is made, while due process regulates the period of confinement after the initial determination of probable cause. Our cases thus establish that the protections of the Fourth Amendment apply at arrest and through the *Gerstein* probable cause hearing, due process principles govern a pretrial detainee's conditions of confinement after the judicial determination of probable cause, and the Eighth Amendment applies following conviction.

*Id*. at 719 (citations and quotations marks omitted) (referring to *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975)); *see also Williams v. Rodriguez,* 509 F.3d 392, 403 (7th Cir. 2007) ("the Fourteenth Amendment's due process protections only apply to a pretrial detainee's confinement conditions after he has received a judicial determination of probable cause."). Thus, the Court did not apply the well-known standards under *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 60

L.Ed.2d 447 (1979), and *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

In their motion, Defendants argue that because the Seventh Circuit had not decided *Lopez* until September 2006 and the conduct surrounding Cobige's death occurred in June 2006, *Lopez* does not apply because it was not the clearly established standard during the relevant time period.[5]  Instead, Defendants argue that the deliberate indifference standard pursuant to the Fourteenth Amendment applies.  *See Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010).  Defendants' argument is without merit.  In holding that the Fourth Amendment standard applied to pretrial detainees who have not had a probable cause determination, the *Lopez* court relied on case law from as early as 1992.  More specifically, the *Lopez* court relied upon *Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992), in which the Seventh Circuit held that "the Fourth Amendment governs the period of confinement between arrest without a warrant and the preliminary hearing at which a determination of probable cause is made, while due process regulates the period of confinement after the initial determination of probable cause."  Other pre-2006 cases also discuss the Fourth Amendment standard.  *See Luck v. Rovenstine,* 168 F.3d 323, 326 (7th Cir. 1999) ("There is, to be sure, a difference between the constitutional provisions that apply to the period of confinement before and after a probable cause hearing:  the Fourth Amendment governs the

---

[5]  Although Defendants use terms associated with qualified immunity in challenging the Fourth Amendment standard, they fail to make any specific qualified immunity arguments in their post-trial briefs.  *See Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *see also Purtell v. Mason,* 527 F.3d 615, 621 (7th Cir. 2008) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.").

former and the Due Process Clause the latter."); *United States v. Fernandez-Guzman,* 577 F.2d 1093, 1097-98 (7th Cir. 1978) ("Fourth Amendment's protection extends beyond the initial seizure to continuing detention.").  Moreover, the Seventh Circuit has relied upon the holding in *Villanova* that the Fourth Amendment governs the period of confinement between a warrantless arrest and a probable cause determination on several occasions.  *See, e.g., Payne v. Churchich,* 161 F.3d 1030, 1040 n.10 (7th Cir. 1998); *Armstrong v. Squadrito,* 152 F.3d 564, 569 (7th Cir. 1998).  Finally, courts in this district have recognized that the Fourth Amendment protects arrested individuals until a probable cause determination is made.  *See, e.g., Pyka v. Village of Orland Park,* 906 F.Supp. 1196, 1217 (N.D. Ill. 1995) ("the Fourth Amendment protects a person from the initial moment of seizure (the arrest) through the period of custody that culminates in a formal arraignment or probable cause hearing.  After a formal charge is made, the arrestee becomes a pretrial detainee who is protected by the Fourteenth Amendment Due Process Clause.").  Because the Fourth Amendment standard was the controlling standard at the time of Defendants' conduct in June 2006, Defendants' argument fails.  The Court therefore denies Defendants' motion for a new trial on this basis.

### C.    Evidence of Patricia Cobige's Drug History and Prior Arrests

Next, Defendants move for a new trial arguing that the Court abused its discretion in denying Defendants' request to introduce evidence of Cobige's past drug use, prior arrests, and criminal convictions.  *See Staub,* 560 F.3d at 658 ("The normal remedy for prejudicial evidentiary error is a new trial.").  To clarify, the Court granted Plaintiff's motion in limine to bar Cobige's prior drug use due to the possibility that Defendants would attempt to introduce the prior drug use as "other bad acts" evidence under Federal Rule of Evidence 404(b).  In addition,

the Court concluded that any probative value of this evidence was substantially outweighed by the danger of unfair prejudice, namely, that the jury would conclude that Cobige was a "bad" person and disregard her allegations that Defendants failed to provide her medical care. *See* Fed.R.Evid. 403.

The Court, however, did allow evidence of Cobige's conviction that had occurred within ten years, but barred evidence of Cobige's prior convictions that occurred over the ten year limit. *See* Fed.R.Evid. 609(b). The Court also rejected Defendants' other arguments regarding Cobige's prior arrests and convictions because Defendants failed to make any arguments that these prior arrests or convictions went to knowledge, intent, or absence of mistake – nor did Defendants make any arguments under the Seventh Circuit's four-part test for determining the admissibility of prior acts under Rule 404(b). *See United States v. Conner,* 583 F.3d 1011, 1018 (7th Cir. 2009); *United States v. Perkins*, 548 F.3d 510, 514 (7th Cir. 2008). Also, the Court denied Defendants' in limine motions concerning Cobige's prior arrests and convictions because any such probative value of this evidence was substantially outweighed by the potential prejudice that Defendants would attempt to use this evidence to show Cobige's "bad" character. *See* Fed.R.Evid. 403; *see also Gora v. Costa,* 971 F.2d 1325, 1331 (7th Cir. 1992) ("courts should be careful to ensure that a civil rights plaintiff's criminal past is not used to unfairly prejudice him or her.").

In the present motion, Defendants argue that the Court abused its discretion in barring Cobige's past drug use, the nature of her arrest on June 10, 2006, and her other convictions because this evidence is relevant to Illinois Pattern Civil Jury Instruction 31.04 that sets out the measure of damages for Illinois Wrongful Death Act claims. In particular, Defendants argue that

pursuant to this Illinois jury instruction, the jury may consider the decedent's sobriety, occupational activities, and habits of industry. *See Dobyns v. Chung,* 399 Ill.App.3d 272, 287, 339 Ill.Dec. 372, 384, 926 N.E.2d 847, 859 (Ill. 2010). That being said, Defendants have failed to explain why the Court abused its discretion in concluding that the probative value of any such evidence was substantially outweighed by the potential prejudice that Defendants would attempt to use this evidence to show Cobige's "bad" character. *See Romanelli v. Suliene,* 615 F.3d 847, 854 (7th Cir. 2010) ("Even though evidence may be relevant it may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice"); *see also* Fed.R.Evid. 403. Because "it is not the obligation of this Court to research and construct the legal arguments available to parties," *see United States v. Alden,* 527 F.3d 653, 664 (7th Cir. 2008), Defendants' evidentiary arguments fail. The Court thus denies Defendants' motion for a new trial on this basis.

### D. Verdict Form

Finally, Defendants argue that the Court erred in giving Plaintiff's proposed verdict form because the verdict form allowed for double recovery. More specifically, Defendants argue that the verdict form was improper because it allowed the jury to award Cobige's estate damages under 42 U.S.C. §1983 for loss of life, as well as awarding Plaintiff separate Illinois Wrongful Death Act damages. Defendants, however, fail to develop their argument with any legal authority. Moreover, Section 1983 loss of life damages and Illinois Wrongful Death Act damages address different injuries suffered by different parties, and thus the verdict form was proper. *See Thomas,* 604 F.3d at 300 n.1; *see also Wyness v. Armstrong World Indus.,* 131 Ill.2d 403, 410, 137 Ill.Dec. 623, 546 N.E.2d 568 (Ill. 1989) ("wrongful death action covers the time

after death and addresses the injury suffered by the next of kin due to the loss of the deceased"). Therefore, Defendants' final argument is without merit and the Court denies Defendants' motion for a new trial in regard to the verdict form.

## CONCLUSION

For the foregoing reasons, the Court denies Defendants Officers' Motion for Judgment as a Matter of Law and/or Motion for a New Trial Pursuant to Federal Rules of Civil Procedure 50(b) and 59(a).

**Date:** October 25, 2010

ENTERED

AMY J. ST. EVE
United States District Court Judge